Filed 7/2/21  P. v. Renz CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RYAN GARY RENZ,<br><br>    Defendant and Appellant. | D077388<br><br><br><br>(Super. Ct. No. SCE367542) |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Affirmed and remanded with directions.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Ryan Gary Renz drove at high speeds while under the influence of alcohol and crashed his vehicle into a tree, killing his two passengers. In a *Watson*[1] homicide case, a jury convicted Renz of two counts of second degree murder (Pen. Code,[2] § 187, subd. (a)), among other charges. The trial court sentenced Renz to an aggregate prison term of 15 years to life.

Renz appeals, contending that (1) the trial court erred by excluding expert testimony of a clinical psychologist on brain development of persons 25 years old and younger, (2) the prosecutor committed misconduct by cross-examining him regarding two prior uncharged incidents of driving under the influence (DUI) in violation of an in limine order excluding these incidents, (3) the court erred by failing to sua sponte give a limiting instruction (CALCRIM No. 375) as to evidence of the prior uncharged DUI that was admitted, (4) the errors were aggregated, resulting in cumulative error, and (5) the trial court's imposition of fines and fees without holding a hearing on his ability to pay violated his constitutional rights to due process.

Renz also argues, and the Attorney General concedes, that the trial court erred in its calculation of fees and assessments and the abstract of judgment must be corrected to reflect the trial court's imposition of a stay of one count under section 654. We agree and accordingly we remand the matter with directions for the court to modify the abstract of judgment as set forth herein. In all other respects, we affirm the judgment as modified.

---

[1]     *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*).

[2]     All undesignated statutory references are to the Penal Code unless stated otherwise.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Evidence at Trial*

A.     *The Crash*

On January 25, 2017, Renz spent the afternoon drinking with his best friend, Dillon W., and his cousin, Johnny M. in the areas of Campo and Alpine in San Diego County.  They "had been drinking throughout the entire day . . . at various places."  At about 5:00 p.m., the three men showed up at Dexter S.'s house with a "couple 12-packs" of beer.  Dexter thought they "were a little bit intoxicated" when they arrived.  All four sat on the front porch for "[a] little under an hour" drinking.  At about 6:00 p.m., Renz, Dillon, and Johnny left, with Renz driving.

That night, U.S. Border Patrol agents were manning the checkpoint at Old Highway 80 in Campo.  They were stopping each vehicle traveling westbound for inspection.  Traffic was slowed down at the checkpoint with orange cones shutting down the lanes and "Prepare to Stop" and "Border Patrol Checkpoint" signs.  A marked Border Patrol service sedan was positioned in the middle of the highway where an agent stood to check traffic traveling west to east towards Interstate 8.  The area was well lit.

At about 6:45 p.m., the agents heard a car speeding from the Interstate 8, Sunrise Highway area.  It "sounded like air being sucked behind the car, as though [one was] at a racetrack or a speedway."  Within seconds, the agents saw a car speed eastbound through the checkpoint in excess of 80 miles per hour.  After the car blew past the checkpoint, Agent Marlin Worrells heard "tires screeching" further up the road and "thought maybe the driver . . . had lost control" of the car.  Worrells jumped into his F-150 Ford pickup truck and drove up the road to see if there had been an accident.  At a guardrail up the

road, he saw skid marks but no car.  He continued eastbound on Old Highway 80 to Buckman Springs Road—a "very narrow" two-lane road with "a lot of curves"—and radioed dispatch to warn other agents who were getting off shift and would be driving that road to "be aware" of a car driving at a "high rate of speed in a dangerous manner."

Between 6:45 p.m. and 7:00 p.m., Jason M. was driving northbound on Buckman Springs Road.  Near an "S-turn" by an elementary school, Jason heard "tires screeching" and saw a car "flying around the corner really fast" in the southbound lane.  Instinctively Jason pulled over to the right "just to get out of the way" and saw the crash.  The car "lost control" and its passenger side "hit the oak tree and kind of tore in half a little bit."  After "flying through the air," it "rolled over a couple of times" before landing on its roof.  Jason turned his car around and went to the crash site, where he called 911.  He saw "one dead body laying [*sic*] on the road" and "thought everybody was dead in the vehicle."

Worrells got to the crash site and saw a car against a tree; it looked like "it [had] exploded" because everything had come apart.  Other Border Patrol agents from the nearby El Cajon station were already there.  The agents, some of whom were veterans with overseas military experience, described the crash site like "a bomb" or an "IED [improvised explosive device] had gone off."  The car was on fire and "upside down."  After agents put out most of the flames with fire extinguishers, Agent Brian Adams got on his hands and knees to look inside the car.  As he pulled out the ignition keys, Adams saw Renz in the driver seat, regaining consciousness, and "most of" another person in the passenger seat.  He also immediately smelled the odor of alcohol and saw "huge-shaped boxes" with "bottles of beer" inside the car.

4

Adams tried to keep Renz in the car until medical personnel arrived, but Renz "became very agitated" and "wanted out of the car." So, Adams and a bystander pushed out the destroyed rear windshield, and Renz climbed out through it. Worrells tried to get Renz out of the middle of the highway, but he was "yelling and screaming." At one point, Renz stated "he had killed his friends." Worrells smelled "a strong scent of alcohol" on Renz.

B.     *The California Highway Patrol (CHP) Investigation*

1.     *Renz's Statements*

At about 7:25 p.m., CHP Officer Johnathon Neibert arrived at the crash site. Neibert approached the ambulance where Renz was being treated and overheard the ambulance personnel ask Renz "how much he had to drink." Renz told them that he "had a 30-pack of beer." It is unclear whether Renz meant he drank 30 beers or that he had a 30-pack of beer in the car.

When Neibert spoke with Renz, he observed that Renz had objective signs of intoxication. His eyes were bloodshot and glassy; his speech was slurred; and Neibert smelled "a strong odor of alcohol" on Renz. Renz told Neibert he was driving south on Buckman Springs Road when "he lost control and hit a tree." Renz said he was driving "90 to 120 miles per hour" at the time of the collision. He said, "he had his foot to the floor and he drives that way every day." When Neibert asked how much he had to drink, Renz said, "he had too much." Neibert did not have Renz perform any field sobriety tests because of his injuries.

Renz was taken to the hospital and there he told Neibert that "he woke up around noon that day" and ate breakfast. Renz admitted that "he'd been drinking [beer] all day," "along the side of the road and [at] different places as he was traveling throughout the county that day." Renz denied feeling the effects of the alcohol, however. He had also "been smoking marijuana"

5

throughout the day. Since he did not have severe injuries, the hospital released Renz that night and Neibert transported him to the San Diego CHP station, where he was placed under arrest for DUI.

After he was advised of his *Miranda*[3] rights, Renz repeated that "he had been drinking throughout the entire day and at various places." Renz stated that he was driving southbound on Buckman Springs Road at the time of the collision, he was "swerving a bit" and "he had to downshift." The next thing he remembered was "being involved in the collision." Renz told Neibert that "he had to have been going at least a hundred [miles per hour] because that's the way he always drives through that area." Renz also told Neibert that he was "too drunk" and "he should have listened to himself and not driven that evening." Further, he said he was driving on a suspended license for "a prior DUI arrest."

2. *Renz's BAC*

Approximately four hours after the collision, Renz had a blood alcohol content (BAC) of 0.115 and 0.106 with breath tests taken at 10:42 p.m. and 10:46 p.m., respectively. It was estimated by retrograde extrapolation that his BAC at the time of the collision would have been between 0.13 and 0.26 percent if he was fully absorbed, and 0.11 and 0.24 percent if he was not fully absorbed, i.e. removing the last drink he consumed. Assuming full absorption, Renz would have consumed 7.6 to 14.8 standard drinks, and 6.5 to 14 standard drinks if there was not full absorption.

3. *Cause of Death*

Dillon and Johnny both died from multiple blunt force trauma sustained during the collision. Toxicology tests showed Johnny had a BAC of

---

[3]    *Miranda v. Arizona* (1966) 384 U.S. 436.

0.25 percent and Dillon had a BAC of 0.11 percent.  Dillon was 26 years old and Johnny 23 years old.

    4.    *Collision Reconstruction*

An accident reconstruction specialist responded to the scene between 9:30 p.m. and 10:00 p.m. on January 25, 2017.  He determined from evidence at the scene that Renz was driving about 86 to 98 miles per hour at the time of the collision.  The area is a 55-mile per hour zone, with an advisory speed of 45 miles per hour for the curves.  A CHP post-collision vehicle inspector concluded there were no mechanical issues with the vehicle itself that contributed to or caused the collision.

C.    *Renz's Trial Testimony*

Renz testified that he started drinking alcohol when he was 13 or 14 years old, and drinking heavily when he turned 17 or 18 years old.  He testified he "became addicted" to alcohol and was unsuccessful at an alcohol treatment program in 2014 or 2015.  He pled guilty in January 2016 to a DUI offense he committed in October 2015.  He was 24 years old at the time of the collision on January 25, 2017.

That day, Renz decided, along with Dillon and Johnny, to look for methamphetamine.  Dillon drove the three of them from Campo to El Cajon to find methamphetamine.  They stopped at a house where they smoked "a bowl or two" of marijuana.  Dillon then drove them to a store where they bought two 12-packs of beer.  They got into the car with Dillon still driving and each drank "one or two beers on the way" to a friend's house.  After leaving their friend's house, they decided to "[g]o find a place to go drink" and Dillon drove them to Alpine to see Dexter.  Renz had one or two more beers.  By the time they got to Dexter's house, one of the 12-packs "was fairly empty."

7

At Dexter's house, Renz pulled out the other 12-pack and the four spent the next couple of hours drinking.  Renz drank "[p]robably three to four [more] beers."  After they finished the second 12-pack, Renz walked with Dillon and Johnny to a store about a half-mile away and bought a 30-pack of beer.  They went back to Dexter's house and continued drinking.  Renz did not recall how many more beers he had, but they did not finish the 30-pack of beers and put what was left in the trunk of Dillon's car.  Dillon gave Renz the car keys, and Renz drove.

Renz testified that he felt "perfectly fine" to drive and had "every confidence that [he] could make it back, to make it where [they] were going."  The only concern he had was "getting pulled over and getting Dillon's car impounded" because he didn't have a license.  It "didn't even cross [his] mind" that he could get into an accident and kill someone.

Renz admitted to speeding on Buckman Springs Road, driving 70 to 80 miles per hour at various moments in the 55-miles per hour zone.  He drove 60 to 70 miles per hour down the curves, where the advisory speed was 45 miles per hour, and testified he had no trouble "negotiat[ing]" the curves.  He "normally drive[s] fairly fast" and he never felt "not in control of the vehicle" that evening.  He "remember[ed] everything perfectly up until" the crash, and then "being upside down" and waking up to "blue and red flashing lights."

II.

*Verdict and Sentence*

The jury found Renz guilty of two counts of second degree murder (§ 187, subd. (a); counts 1 & 2); two counts of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a); counts 3 & 4); driving under the influence of alcohol causing injury with a prior DUI conviction within 10 years (Veh. Code, § 23153, subd. (a); count 5); driving with a measurable BAC

8

causing injury with a prior DUI conviction within 10 years (Veh. Code, § 23153, subd. (b); count 6); and driving on a suspended license for a prior DUI conviction (Veh. Code, § 14601.2, subd. (a); count 7). As to counts 3 and 4, the jury also found true the allegations that Renz personally inflicted great bodily injury upon the victims and was driving at an unsafe speed for conditions and proximately caused bodily injury or death to more than one victim (§ 1192.7, subd. (c)(8); Veh. Code, §§ 22350, 23558). Renz admitted the allegation that he had a prior conviction for which he served time in prison (§ 667.5, subd. (b)).

The trial court sentenced Renz to an aggregate state prison sentence of 15 years to life, consisting of concurrent terms of 15 years to life on counts 1 and 2. A term of 11 years, consisting of the upper term plus one year for the Vehicle Code section 23558 allegation, was imposed on each of counts 3 and 4, to run concurrently, but stayed pursuant to section 654. Counts 5 and 6 were dismissed at the prosecution's request. A concurrent term of 180 days was imposed on count 7.

## DISCUSSION

### I.

*No Error in Exclusion of Expert Testimony on Brain Development*

Renz contends that the trial court erred by excluding expert testimony of a clinical psychologist, Dr. Kristina Malek, on "the science behind brain development in adolescents and young adults" and "the effect of alcohol on brain development." It was Dr. Malek's opinion "that a person's brain is not fully connected to their frontal lobe until they are closer to the age of 25-years-old," an undefined " 'alcohol disorder' . . . could impact a person's brain development," and such "youthful factors can negate the person from

9

understanding potential risks as a result of impulsive behavior." Renz argues her testimony was relevant to "negate" implied malice, in particular that Renz did not "act[ ] with a conscious disregard for human life." We conclude the trial court did not abuse its discretion in excluding the proposed testimony.

A.      *Standards for Admission of Expert Opinion Testimony*

" 'Expert opinion testimony is admissible only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' " (*People v. McDowell* (2012) 54 Cal.4th 395, 425–426 (*McDowell*), quoting *People v. Watson* (2008) 43 Cal.4th 652, 692; Evid. Code, § 801, subd. (a).) It is not admissible if it relates to a subject " 'of such common knowledge that men [and women] of ordinary education could reach a conclusion as intelligently as the witness[.]' " (*People v. Harvey* (1991) 233 Cal.App.3d 1206, 1227 (*Harvey*).) Whether the proffered testimony adds sufficiently to "the jury's common fund of information" (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1169) is a judgment call left to the trial court's broad discretion (*McDowell*, *supra*, 54 Cal.4th at p. 426). Expert testimony must also be relevant to a material fact in the case to be admissible. (*People v. William*s (2008) 43 Cal.4th 584, 633.)

We review a trial court's decision to admit or exclude expert testimony for abuse of discretion. (*McDowell*, *supra*, 54 Cal.4th at p. 426; accord *People v. Pearson* (2013) 56 Cal.4th 393, 443.) In doing so, "[w]e do not consider whether a trial court reasonably could have admitted the expert opinion evidence in this case. Our only inquiry [as a reviewing court] . . . is whether the trial court's decision to exclude the expert opinion testimony constituted an abuse of discretion." (*McDowell*, at p. 428, fn. 22.) A " ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate

10

tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' " (*Id.* at pp. 429–430.)  Rather, a trial court abuses its discretion only where it acted " 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Id.* at p. 430)  Thus, "we will not disturb the [trial] court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner." (*People v. Jones* (2013) 57 Cal.4th 899, 947.)

We do not agree with Renz's contention that we should apply de novo review because, as he asserts, "the court's error lay in its misinterpretation of relevance" under Evidence Code section 210.  Specifically, Renz argues the trial court erred by requiring Dr. Malek's proffered testimony to be "conclusive to be relevant."  Renz's reliance on *People v. Walker* (2006) 139 Cal.App.4th 782 is misplaced, as that case involved a matter of statutory interpretation, which is reviewed de novo.  (*Id.* at pp. 797–798 [interpreting Evidence Code section 1108, which provides that evidence of "another sexual offense or offenses" are admissible against a defendant who "is accused of a sexual offense," in reviewing de novo whether trial court erred in admitting evidence of uncharged prior sexual assaults against a defendant charged solely with murder].)  We also see nothing in the record to suggest that the trial court applied an incorrect legal standard for relevance under Evidence Code section 210.  As we will explain, the trial court's determination that Dr. Malek's proffered testimony was speculative and not relevant was a straightforward application of the evidentiary rules on relevance and the admissibility of expert opinion testimony.

B.      *The Trial Court Did Not Exceed the Bounds of Reason in Concluding Behavioral Differences Between Younger and Older Adults Are Within the Jury's Common Knowledge*

Defense counsel asserted at trial that "every 24-year-old [including Renz] fits into [the] category" of persons whose "frontal lobe isn't fully developed or hasn't fully connected, and that the frontal lobe is what controls our impulses and our decision-making." Defense counsel conceded she was not presenting any evidence that Renz suffered from "a particular condition." Defense counsel further stated that Dr. Malek would not testify to Renz "specifically" or "make any ultimate conclusions," but she would "testify that individuals that fall within this age range, which [Renz] does, have difficulty, based on the science of their brain formation," in understanding potential risks. Defense counsel argued Dr. Malek's testimony "goes towards potentially [Renz's] mindset" and would negate implied malice, in particular the allegation that Renz "acted with a conscious disregard for human life."

The trial judge questioned what Dr. Malek would "offer the jury that they don't [already] know," stating that "there's no question that somebody who's 24 probably doesn't have the maturity or the judgment that of somebody who's 44." The trial judge questioned whether an expert was needed to explain what he viewed as "common sense." The trial judge also asked defense counsel, "are you asking [the jury] to speculate as to whether your client fits or doesn't fit into this category [of persons with an undeveloped frontal lobe]?" Defense counsel responded that every 24-year-old person, including Renz, fits into the category.

However, the prosecution clarified that Dr. Malek did not conclude in her statement that "all people" in this age category have an undeveloped frontal lobe." Rather, Dr. Malek opined it was "a general age" and that "people could still be going under the brain development. It's not a definite

12

thing." The prosecution argued there were "so many leaps of logic" to ask the jury to conclude from testimony that Renz "could potentially have this issue" that Renz specifically had an undeveloped brain, particularly where Dr. Malek did not consider "further information or [conduct] any further analysis for this specific defendant." It was not disputed that Dr. Malek never met or spoke with Renz, and she had not reviewed any "previous history" of Renz, including "medical records, criminal history, or any other history related to his upbringing," or the police reports in the case.

After considering the arguments, the trial court excluded Dr. Malek's proffered testimony. It found that Dr. Malek's proffered testimony would not "help the jurors decide" whether "[Renz's] actions posed a wanton disregard for human life." It further found the proffered testimony speculative because there was no evidence being offered about Renz's brain development in particular. Accordingly, the trial court excluded Dr. Malek's proffered testimony as not relevant and speculative.

The trial court did not exceed the bounds of reason in concluding behavioral differences between younger and older adults are commonly known. A " 'lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' " (*Roper v. Simmons* (2005) 543 U.S. 551, 569, quoting *Johnson v. Texas* (1993) 509 U.S. 350, 367.) It is simply common knowledge that adolescents are less able to control their impulses than mature adults, and that as a result they often engage in riskier behavior. Thus, we cannot say the trial court's determination that Dr. Malek's testimony failed to relate to a subject beyond the jury's common experience is " 'so irrational or arbitrary that no reasonable person could agree with it.' "

13

(*McDowell*, *supra*, 54 Cal.4th at p. 430.) When the jury can reach a conclusion as intelligently as the expert witness, the expert's testimony is not admissible. (Evid. Code, § 801; *Harvey*, *supra*, 233 Cal.App.3d at p. 1227.)

The trial court also found the proposed testimony not relevant and speculative because Dr. Malek would not be providing any evidence about Renz specifically. Although at trial, defense counsel conceded there was no evidence that Renz suffered from "a particular condition," Renz now asserts, in his reply brief, that he had a " 'condition' " at the time of the collision for which expert testimony is proper. That condition apparently is being a person under 25, "subject to [the] deficiency" of an undeveloped frontal lobe. To be sure, evidence of "a mental disease, mental defect, or mental disorder" may be admissible to show whether a defendant actually formed a mental state required for a charged offense.[4] (§ 28, subd. (a); *People v.*

---

[4] On appeal, the Attorney General contends Dr. Malek's proffered testimony was inadmissible under sections 28 and 29 as evidence of diminished capacity. Specifically, the Attorney General contends Dr. Malek's testimony "would in essence be inferring that appellant had a lesser capacity to form the specific intent of conscious disregard for human life" necessary to support a conviction for second degree murder under *Watson*, *supra*, 30 Cal.3d 290. However, the prosecution did not object to Dr. Malek's testimony on these grounds at trial. As such, there was no discussion before the trial court of diminished capacity. "[T]he general rule [is] that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court *on the ground sought to be urged on appeal*." (*People v. Rogers* (1978) 21 Cal.3d 542, 548, italics added.) Thus, the contention is forfeited. While we may exercise our discretion to excuse the forfeiture because the contention arguably presents only a question of law (*People v. Sue Sarkis Bail Bonds* (1986) 182 Cal.App.3d 650, 656), we need not and do not reach the issue of diminished capacity since we conclude the trial court was within its discretion to exclude Dr. Malek's testimony under the standards of Evidence Code sections 210 and 801, subdivision (a).

*Coddington* (2000) 23 Cal.4th 529, 582.) But Renz provides no legal support that having a youthful brain is a "condition," let alone a mental disease, defect, or disorder, that would require expert testimony at the *guilt phase* of trial. His reliance on the United States Supreme Court's decision in *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*) and section 3051 for the proposition that there is an "emerging scientific understanding" of the differences between adults and youth is misplaced.

In *Miller*, the United States Supreme Court held "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Miller*, *supra*, 567 U.S. at p. 479.) In so doing, the *Miller* court reiterated from a line of earlier cases that "children are constitutionally different from adults for *sentencing purposes*." (*Id.* at p. 461, italics added.) Similarly, in 2017, the Legislature amended section 3051, increasing the age of individuals afforded a youth parole eligibility hearing from 23 to 25, "such that offenders serving a determinate or life sentence for crimes committed when they were 25 or younger are now eligible for a youth offender parole hearing." (*People v. Acosta* (2021) 60 Cal.App.5th 769, 777.) Both *Miller* and section 3051 concern the level of punishment and rehabilitative measures appropriate for minors who commit criminal acts, *not* their criminal culpability at the guilt phase of trial. The common knowledge that the youthful mind is different from the adult mind is only relevant for purposes of sentencing.

Here, Dr. Malek did not examine Renz or review his medical history, criminal records, or any documents relating to his upbringing. Defense counsel confirmed that Dr. Malek would not testify to Renz "specifically," only that individuals who "fall within this age range" of 25 years old and younger have difficulty in understanding potential risks. But as the trial court

15

reasonably pointed out, individuals have a wide spectrum of maturity levels in any age range. It was not arbitrary or capricious for the court to conclude that Dr. Malek's testimony about the brain development of persons in this age group *in general* would be speculative as to Renz and his potential state of mind. "[T]he trial court [properly] acts as a gatekeeper to exclude speculative or irrelevant expert opinion." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770.)

Renz argues that the trial court misinterpreted the standard for relevance under Evidence Code section 210 by focusing on the fact that Dr. Malek did not specifically examine Renz. Citing *People v. Horning* (2004) 34 Cal.4th 871 (*Horning*), he argues "[e]vidence does not need to be conclusive to be relevant." *Horning* involved forensic ballistic evidence and probabilities of ballistic matches; it simply has no application here. Nevertheless, the trial court viewed Dr. Malek's testimony as irrelevant and speculative, not only because she failed to specifically examine Renz, but, as the prosecutor pointed out, Dr. Malek's testimony was that people in Renz's age bracket "*could* still be going under [ ] brain development. It's not a definite thing." " '[A]n expert's opinion that something *could be true* if certain assumed facts are true, without any foundation for concluding those assumed facts exist in the case before the jury, does not provide assistance to the jury because the jury is charged with determining what occurred in the case before it, not hypothetical possibilities.' " (*People v. Wright* (2016) 4 Cal.App.5th 537, 545, italics added.)

On appeal, we do not determine whether the trial court *could* have admitted the expert opinion evidence in this case, as Renz urges. Our only inquiry is whether the trial court's decision to exclude the expert opinion

16

testimony constituted an abuse of discretion. (*McDowell*, *supra,* 54 Cal.4th at p. 428, fn. 22.) And no abuse appears from the record before us.

C.   *Any Error Was Harmless*

Even if we were to assume the trial court erred in excluding Dr. Malek's testimony, we conclude any error was harmless.

At the outset, we reject Renz's contention that the exclusion of Dr. Malek's testimony violated his federal constitutional rights. " '[T]he routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights.' [Citations.] This is so because 'only evidentiary error amounting to *a complete preclusion* of a defense violates a defendant's federal constitutional right to present a defense.' " (*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 756 (*Sotelo-Urena*), italics added.) As Renz concedes, the trial court's exclusion merely precluded him from proffering *one* basis (in the form of expert testimony) by which to raise a reasonable doubt regarding his subjective state of mind. This did not amount to a complete preclusion of a defense. Accordingly, any error "was one of state evidentiary law only [citation], and the proper standard of review is whether it is reasonably probable that defendant would have obtained a more favorable result in the absence of the error." (*Sotelo-Urena*, at p. 756, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) Under this standard, we conclude there was no prejudice even if the trial court's evidentiary ruling was error.

The element of implied malice in a *Watson* homicide requires proof that Renz was subjectively aware of the risk of death created by driving while intoxicated. (*Watson*, *supra*, 30 Cal.3d at pp. 296–297.) "[M]alice may be implied when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life." (*Id.*

at p. 296, italics omitted.) "Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*Id.* at p. 300.) "[A] finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*Id.* at pp. 296–297.)

Here, there simply was overwhelming evidence that Renz knew driving while intoxicated could kill someone and he nonetheless chose to get behind the wheel when his ability to drive safely was seriously impaired.

In his May 2011, February 2014, and May 2015 applications to the Department of Motor Vehicles for a driver's license or identification card, Renz signed under penalty of perjury that he read and understood the advisement of the dangers of driving while under the influence. The advisement warned Renz "that being under the influence of alcohol or drugs or both impairs the ability to safely operate a motor vehicle," and that driving under the influence is "extremely dangerous to human life[.]" The advisement further warned Renz that a death could result, and that he could then be charged with murder.

Renz was previously convicted of a DUI, and the circumstances of that prior conviction demonstrated his subjective awareness of the risk of bodily harm from his actions. On October 23, 2015, Officers from the San Diego Police Department responded to a call of a collision at a bowling alley. Renz told the officers he was driving really fast, pulled into the parking lot, overcorrected, and hit several parked cars. Renz admitted he left the collision scene but came back to make sure no one was in the cars he hit, impliedly acknowledging that his actions could have injured someone. Renz showed objective signs of intoxication and he blew a 0.12 percent and 0.11

18

percent on a preliminary alcohol screening test. A subsequent blood test showed his BAC was 0.11 percent. On January 5, 2016, Renz pled guilty to driving with a measurable BAC, in violation of Vehicle Code section 23152, subdivision (b).

As part of his plea, he completed a DUI addendum form acknowledging the consequences of his actions and the *Watson* advisement. The *Watson* advisement again warned Renz: " '[B]eing under the influence of alcohol or drugs, or both, impairs your ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If you continue to drive while under the influence of alcohol or drugs, or both, and, as a result of that driving, someone is killed, you can be charged with murder.' " (Veh. Code, § 23593, subd. (a).) Renz's former counsel testified that based on her general practice, she would have read verbatim the *Watson* advisement to Renz, provided him an opportunity to ask questions, and explained it more simply if he did not understand it.

On the date of the fatal DUI collision, Renz admitted to Neibert that he was "too drunk" and "he should have listened to himself and not driven that evening." Further, he knew he was driving on a suspended license for "a prior DUI arrest" and he knew he was speeding, driving "at least a hundred [miles per hour]" through Buckman Springs Road.

Finally, Renz admitted at trial he knew, prior to the date of the collision, that driving under the influence was dangerous to human life. He admitted knowing someone could get hurt or killed and chose to drink and drive regardless of this knowledge:

> PROSECUTOR: "Prior to January 25th of 2017 you knew
> that driving under the influence was dangerous, right?"

RENZ:  "Yes."

PROSECUTOR:  "You could potentially get hurt?"

RENZ:  "Yes, potentially."

PROSECUTOR:  "You knew your passengers could get hurt, right?"

RENZ:  "Yes."

PROSECUTOR:  "You knew somebody else could get hurt?"

RENZ:  "Yes."

PROSECUTOR:  "And you knew at the worst that somebody can get killed, correct?"

RENZ:  "Yes."

PROSECUTOR:  "And on January 25th of 2017 you chose to drink, right?"

RENZ:  "Yes, I did."

. . .

PROSECUTOR:  "You chose to drive from Alpine to Campo, right?"

RENZ:  "Yes."

Although Renz later tried to rehabilitate these statements, the jury, as the triers of fact, was permitted to credit Renz's admissions.  (*People v. Bodkin* (1961) 196 Cal.App.2d 412, 414 ["[T]he trier of the facts may reject a part of the testimony of a defendant or any other witness while accepting or believing other portions of his testimony."].)

Given the overwhelming evidence of implied malice, there is no reasonable probability Renz would have obtained a more favorable verdict had Dr. Malek testified that persons who are 25 years old and younger may

have difficulty understanding risks. Any error resulting from the exclusion of her testimony was harmless.

II.

*Prosecutorial Misconduct*

Renz contends the prosecutor committed misconduct during cross-examination by questioning him about two prior uncharged DUI incidents in violation of the trial court's in limine ruling excluding evidence of these incidents. We conclude Renz forfeited this claim by failing to request an admonition. Even assuming Renz had preserved the claim for appeal, we conclude any misconduct was harmless.

A.    *In Limine Ruling*

The prosecution moved in limine to admit evidence of three uncharged acts where Renz was contacted by law enforcement for driving under the influence to prove implied malice, pursuant to Evidence Code section 1101, subdivision (b).[5]

The first incident occurred on August 13, 2013. A San Diego County Sheriff's deputy responded to a report of three individuals "breaking out the windows of the vehicle they were in." A witness at the scene identified Renz as the driver. When the deputy observed that Renz showed objective signs of intoxication, he had Renz perform field sobriety tests and determined Renz was under the influence. A subsequent blood test showed Renz's BAC was 0.16 percent. Renz was charged with multiple crimes, including

---

[5]    Evidence Code section 1101, subdivision (b) allows for "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .) other than his or her disposition to commit such an act."

misdemeanor DUI. He pled guilty to two other charges in exchange for dismissal of the DUI.

The second incident occurred on October 23, 2015 and resulted in Renz pleading guilty to a DUI on January 5, 2016. We have already discussed this DUI, *ante*.

The third incident occurred on January 20, 2016. Sheriff's deputies responded to a call of a reckless driver who had parked his car and walked away. When they arrived, the deputies saw Renz walking with a gas can about 25 yards from his parked car. Renz showed objective signs of intoxication. He was arrested for possession of a "makeshift" mace (or billy club weapon) found in his car and for being under the influence of a controlled substance. He was charged only with possession of the mace and pled guilty to that charge.

The trial court allowed evidence of the October 23, 2015 incident at the bowling alley parking lot, reasoning that Renz's return to the scene to make sure no one was hurt and the conviction with the *Watson* advisement were relevant to show implied malice. However, the court excluded the August 13, 2013 and January 20, 2016 incidents as "essentially propensity evidence." The court further found that any probative value of the evidence would be substantially outweighed by undue prejudice, consumption of time, and would mislead the jury, under an Evidence Code section 352 analysis.

B.     *The Prosecutor's Cross-Examination of Renz*

On direct examination, Renz was asked if he had completed the Mothers Against Drunk Driving impact program. Renz testified he had not because he had been arrested for "a billy club case" and had "served some time in jail." Renz also testified that on "a handful of times . . . [m]aybe four or five" times, he had "gotten drunk to the point where [he was] not able to

drive." When he "realized that [he] shouldn't be driving, . . . [he] usually pulled over when that happened." According to Renz, there was never a time where he would continue driving when, after drinking, he felt he didn't have "control" and "was going to crash" his car.

In two separate exchanges during cross-examination, the prosecutor questioned Renz regarding the two prior incidents which had been excluded by the trial court. In the first exchange, the prosecution asked Renz about the January 20, 2016 incident:

> PROSECUTOR: "You mentioned on direct examination that you were convicted of a billy club that you went to prison for; do you recall talking about that?"
>
> RENZ: "I did not go to prison for it, I did what is called a stayed local commit. It's a prison sentence that you serve locally in county jail."
>
> PROSECUTOR: "It was for a billy club, right?"
>
> RENZ: "Yes."
>
> PROSECUTOR: "You were arrested for that on January 20th, of 2016, fifteen days after the DUI case, correct?"
>
> RENZ: "Yes."
>
> PROSECUTOR: "What happened in that case?"
>
> DEFENSE COUNSEL: "Objection. Relevance."
>
> COURT: "Sustained."
>
> PROSECUTOR: "In that case you were actually driving a vehicle, right?
>
> DEFENSE COUNSEL: "Objection, your Honor. Relevance. Motions in limine."
>
> COURT: "Sustained."

PROSECUTOR: "In that case you were driving on Dewey Place, correct?"

DEFENSE COUNSEL: "Objection, your Honor."

COURT: "Sustained. Counsel, we've been through this. We're not getting into the facts."

PROSECUTOR: "He's opened the door, your Honor. If we can sidebar?"

COURT: "No, he has not. Move on."

Later, the prosecutor questioned Renz about the August 13, 2013 incident:

PROSECUTOR: "You did not pull over in August of 2013 when you drove from Jamul to Alpine 20 miles, right?"

RENZ: "I'm sorry?"

DEFENSE COUNSEL: "Objection, your Honor."

COURT: "Overruled. Do you understand the question?"

RENZ: "I'm trying to understand the date."

COURT: "Why don't you repeat it."

PROSECUTOR: "Sure. August 13 -- August 13th of 2013 you did not pull over when you drove from Jamul to Alpine about 20 miles, right?"

DEFENSE COUNSEL: "Objection, your Honor."

RENZ: "I don't remember that date."

DEFENSE COUNSEL: "It's not --"

COURT: "I'm going to sustain that."

PROSECUTOR: "You were contacted by a deputy at that time, right?"

24

DEFENSE COUNSEL: "Objection, your Honor. Motions in limine."

COURT: "Sustained."

PROSECUTOR: "You had a field sobriety test, correct?"

DEFENSE COUNSEL: "Objection, your Honor."

COURT: "Counsel, we have been through this."

PROSECUTOR: "Your Honor, may I go sidebar?"

COURT: "No."

At the conclusion of defense counsel's redirect, the prosecutor requested a jury break for a sidebar conference. The court excused the jury and immediately asked the prosecutor, "Why are we going through the things that we talked about during in limines?" The prosecutor explained that Renz "opened the door to the fact that he would pull over every time he felt drunk" and argued evidence of the two prior incidents refuted that claim. The court disagreed, telling the prosecutor, "we are staying out of it. . . . It's out." The court further admonished the prosecutor that if she wanted to question in an area of excluded evidence, she should first "ask to go into them . . . you don't just dive into them." When recross examination resumed, the prosecutor did not return to this area of inquiry.

C.    *Renz Forfeited His Claim of Prosecutorial Misconduct*

"To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct." (*People v. Price* (1991) 1 Cal.4th 324, 447 (*Price*).) "Simply to object or make an assignment of misconduct without seeking a curative admonition is generally not enough." (*People v. Bonin* (1988) 46 Cal.3d 659, 689 (*Bonin*), overruled on other grounds by *People v. Hill* (1998)

25

17 Cal.4th 800.) " 'The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.' " (*Bonin*, *supra*, 46 Cal.3d at p. 689.) "A defendant will be excused from the requirement of making a timely objection and/or a request for admonition if either would have been futile." (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.)

Although defense counsel timely objected to the prosecutor's questions, and the court sustained the objections, she did not request an admonition. Renz argues that no admonition could have cured the prejudice caused by the prosecutor's purported misconduct. We do not agree. There is nothing in the record to suggest that the court could not have fashioned an appropriate admonition to the jury. (See *People v. Bolton* (1979) 23 Cal.3d 208, 215, fn. 5 [providing example of a sharply worded cautionary instruction]; *People v. Earley* (2004) 122 Cal.App.4th 542, 548–549 [any prosecutorial misconduct cured by trial court's timely admonition to the jury about limited purpose of evidence of prior uncharged offense].) We also do not agree with Renz that the prosecutor's questions created such an indelible impression on the jurors that they would be unable to follow any admonition given to them. "Jurors are presumed to understand and follow the court's instructions." (*People v. Holt* (1997) 15 Cal.4th 619, 662 (*Holt*).)

We, therefore, conclude Renz has failed to preserve any claim of prosecutorial misconduct for appeal.

D. *While Inappropriate and Overzealous, the Prosecutor's Conduct Did Not Rise to the Level of Misconduct*

Despite our conclusion that Renz forfeited his prosecutorial misconduct claim, we exercise our discretion to review this claim on the merits. (*People v. Williams* (2009) 170 Cal.App.4th 587, 628.) " 'The applicable federal and

state standards regarding prosecutorial misconduct are well established.' " (*People v. Navarette* (2003) 30 Cal.4th 458, 506.) A prosecutor's behavior " ' " 'violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " ' " (*Ibid.*) " 'Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*Ibid.*)

Here, the record shows the prosecutor directed a series of questions to Renz regarding the excluded January 20, 2016 incident. The trial court sustained three objections, including one based on the trial court's in limine ruling, before cautioning the prosecutor, "we've been through this" and "[w]e're not getting into the facts." The court subsequently rejected the prosecutor's argument that Renz had opened the door to these questions on direct and instructed the prosecutor to "[m]ove on." Even after this instruction, the prosecutor persisted and directed a second series of questions to Renz regarding the excluded August 13, 2013 incident. The trial court sustained two more objections to these questions before finally instructing the prosecutor "we have been through this" and rejecting the request for a sidebar conference.

On appeal, the Attorney General contends the prosecutor mistakenly believed Renz had opened the door to these questions during direct examination. Although a showing of the prosecutor's subjective good faith cannot defeat a claim of prosecutorial misconduct (*Price, supra,* 1 Cal.4th at p. 447), it appears from the record that the prosecutor believed questions regarding the excluded incidents were appropriate to refute Renz's testimony

that he would "always pull over any time he was drunk" with evidence of two specific instances in which he had not. Even if the prosecutor's belief was reasonable however, the appropriate approach—as the trial court itself stated—would have been to request permission from the court to ask her questions, not "just dive into them."

"[A] prosecutor may not intentionally elicit inadmissible testimony." (*People v. Sims* (1976) 64 Cal.App.3d 544, 554.) "Such misconduct is exacerbated if the prosecutor continues to attempt to elicit such evidence after defense counsel has objected." (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) Here, it should have become quickly apparent to the prosecutor that the trial court would not permit questions directed to the excluded prior DUI incidents. By continuing to pursue this line of questioning not just once, but a second time *after* the trial court had already explicitly directed the prosecutor to "move on," the prosecutor's conduct was inappropriate. We do not find however that the prosecutor's behavior rose to the level of misconduct.

*Price*, *supra,* 1 Cal.4th 324 and *People v. Trinh* (2014) 59 Cal.4th 216 (*Trinh*) are instructive. In *Price*, defendant contended the prosecutors committed misconduct by eliciting inadmissible evidence in violation of the trial court's rulings. (*Price*, at p. 451.) In one claimed instance of misconduct, the trial court advised prosecutors that they had twice attempted to violate the court's ruling forbidding reference to specific evidence, and cautioned the prosecutors: " 'pretty soon somebody is going to be held in contempt here.' " (*Id.* at p. 453.) Despite this conduct, the Supreme Court in *Price* noted this "strong action" prevented any further reference to the precluded evidence. (*Ibid*.) The *Price* court also found that in looking at each of the claimed instances of misconduct, the prosecutors had not "frequently or

systematically disregarded trial court rulings." (*Ibid.*) Accordingly, the *Price* court concluded that the charge of prejudicial misconduct was "not supported by the record." (*Ibid.*)

In contrast, in *Trinh*, the Supreme Court found misconduct where the prosecutor disregarded the trial court's admonition and proceeded to repeatedly ask multiple witnesses specific questions the trial court had prophylactically barred, even after the court "time and again sustained objections." (*Trinh*, *supra*, 59 Cal.4th at pp. 247–248.)

Here, as in *Price* and unlike in *Trinh,* after the trial court strongly cautioned the prosecutor in her second round of questions that "we've been through this" and "[w]e're not getting into the facts," the prosecutor ceased. Reviewing both claimed instances of misconduct, the prosecutor did not "frequently or systematically disregard[ ] [the] trial court['s] rulings." (*Price*, *supra*, 1 Cal.4th at p. 453.)

Renz argues the prosecutor's conduct was equivalent to " '[i]mproper vouching,' " which he describes as a "tactic [that] communicates to the jury that there is more evidence of guilt that the prosecution cannot present because the defense and the judge won't let her." The cases he cites in support of this argument, however, are inapposite and demonstrate "improper vouching" did not occur here. " 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the *argument*, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the *argument*.' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480 [prosecutor vouching for the credibility of witnesses during closing arguments], italics added; *People v. Anderson* (2018) 5 Cal.5th 372, 415 [involving claim that prosecutor vouched for evidence when he argued " 'I believe with all my heart

that I've provided you with the evidence to prove that [but for defendants the victim would be alive] is true' " during closing argument].) Those are not the facts here. The prosecutor was not improperly vouching for witness credibility or for the evidence, and the alleged misconduct did not take place at closing argument.

In sum, we decline to find the prosecutor's behavior rose to the level of misconduct.

E.    *Any Error Was Harmless*

While we do not condone the prosecutor's overzealousness, on the record before us, we conclude that any error was harmless. "[I]n the absence of prejudice to the fairness of a trial, prosecutor misconduct will not trigger reversal." (*People v. Bolton* (1979) 23 Cal.3d 208, 214.) Errors that rise to the level of federal constitutional error are prejudicial unless the state "prove[s] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24.) Errors under California law are prejudicial when "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson*, 46 Cal.2d 818, 836.)

Renz argues that the jurors "were invited to conclude" he had two prior DUI arrests which were being withheld from them by the defense attorney and the court. "Generally, there is no prejudice where an objection is made and sustained." (*Trinh, supra*, 59 Cal.4th at p. 249.) While the prosecutor's questions were certainly persistent, they were brief, the defense's objections were sustained, and the questions went unanswered. The "posing of these questions alone" was not prejudicial. (*Ibid*.) Indeed, Renz volunteered, on direct examination, about his propensity to drive under the influence. Renz testified that he drove after drinking "two, three times out of the week on a

regular basis" before the collision.  He recalled driving drunk "maybe a handful" of times.

In addition, the jury was properly instructed prior to deliberations that "[n]othing the attorneys say is evidence," "[the attorney's] questions are not evidence," and not to "assume something is true just because one of the attorneys asked a question that suggested it was true."  The jury was also properly instructed to ignore questions where the trial court had sustained an objection and to not "guess what the answer might have been" if the trial court had ruled otherwise.  "In the absence of evidence to the contrary, we assume the jury followed this instruction."  (*People v. Lucas* (2014) 60 Cal.4th 153, 321, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1.)

Most importantly, there was no dispute Renz was driving while under the influence and caused the fatal collision.  There was also no dispute Dillon and Johnny died from injuries sustained in the collision.  The only issue at trial was whether Renz had the requisite state of mind for implied malice second degree murder.  As already set forth *ante*, there was overwhelming evidence supporting the jury's finding that he did.  The prosecutor's questions "could not have prejudiced defendant, especially given the strong evidence of his guilt."  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1344.)

III.

*Instructional Error*

Renz contends the trial court erred by failing to sua sponte instruct the jury on the limited purpose of the evidence of the uncharged October 23, 2015 DUI, pursuant to CALCRIM No. 375.  Renz contends this failure ensured the prior uncharged offense would be improperly used by the jury as propensity evidence.  Alternatively, Renz contends that if he has forfeited this claim, he

31

was denied effective assistance of counsel by his counsel's failure to request this instruction. We conclude the trial court did not have a sua sponte duty to give the limiting instruction, Renz forfeited the claim, and defense counsel's failure to request a limiting instruction did not constitute ineffective assistance of counsel.

A.    *No Sua Sponte Duty to Instruct*

"[A] claim that a court failed to properly instruct on the applicable principles of law is reviewed de novo." (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) The Supreme Court has "consistently held that where, as here, a defendant fails to request an instruction, a trial court 'generally [has] no duty to instruct on the limited admissibility of evidence.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 139 (*Valdez*).)[6]

In *People v. Collie* (1981) 30 Cal.3d 43 (*Collie*), the Supreme Court recognized a "narrow exception" where a sua sponte instruction is required on the limited admissibility of other crimes in the " 'occasional extraordinary case in which unprotested evidence of past offenses is a *dominant part* of the evidence against the accused, and is both highly prejudicial *and minimally relevant to any legitimate purpose*.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 854, italics added, quoting *Collie, supra*, at p. 64.)

Although Renz's counsel did not request a limiting instruction, Renz contends his case nevertheless falls within *Collie*'s exception for the extraordinary case. We disagree. This case does not present the type of *extraordinary* circumstance contemplated by *Collie*'s narrow exception. As

---

6    While Renz suggests we revisit these cases, it is not our function "to attempt to overrule decisions" of the Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Renz concedes, "the third prong is not present[.]" Renz's prior DUI arrest, the underlying facts of him returning to the scene, and the *Watson* advisement he received in relation to his conviction, were more than minimally relevant to the elements of implied malice. Nor did the prior uncharged offense "dominate" the evidence against Renz. (*People v. Griggs* (2003) 110 Cal.App.4th 1137, 1140 [no *sua sponte* instruction required; evidence of appellant's prior felony convictions "did not dominate the People's case and was substantially relevant" to charges being tried]; (*People v. Woods* (1991) 226 Cal.App.3d 1037, 1054 [holding *Collie* exception did not apply where evidence of gang membership was more than minimally relevant to any legitimate purpose].)

This not being an extraordinary case as contemplated by *Collie*, we conclude the trial court had no sua sponte duty to instruct the jury with CALCRIM No. 375. In the absence of such a request, Renz forfeited the claim. (*Valdez, supra*, 55 Cal.4th at p. 149 ["[A] defendant who fails to ask the trial court to give a limiting instruction may not raise the issue on appeal."].)

B.      *No Ineffective Assistance of Counsel*

Alternatively, Renz contends his trial counsel was ineffective in failing to request a limiting instruction pursuant to CALCRIM No. 375. "The test for ineffective assistance of counsel is a demanding one." (*People v. Acosta* (2018) 28 Cal.App.5th 701, 706.) To establish ineffective assistance, a defendant has the burden to show his counsel's performance was deficient, and that he or she suffered prejudice as a result. (*People v. Mickel* (2016) 2 Cal.5th 181, 198; *Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Acosta, supra*, at p. 706.) The claim fails in the absence of either one of these components. (*Holt, supra,* 15 Cal.4th at p. 703.)

33

"To make out an ineffective assistance claim on the basis of the trial record, the defendant must show '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.) "'A reviewing court will not second-guess trial counsel's reasonable tactical decisions.'" (*People v. Woodruff* (2018) 5 Cal.5th 697, 762.)

Here, the record is silent as to defense counsel's reasons for not requesting a CALCRIM No. 375 instruction. However, we disagree with Renz that there was no tactical reason for counsel's failure. It is certainly conceivable, for example, that defense counsel did not want to unduly highlight Renz's prior DUI conviction. "A reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide." (*People v. Maury* (2003) 30 Cal.4th 342, 394.)

At the very least, on a silent record as we have here, we will not assume defense counsel's failure to request the limiting instruction rendered her assistance ineffective. As the Supreme Court has "repeatedly stressed," if "'"the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal *must be rejected*.'" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266, italics added.) "[T]actical choices presented . . . on a silent record . . . are better evaluated by way of a petition for writ of

34

habeas corpus, and on direct appeal we reject them." (*People v. Mayfield* (1993) 5 Cal.4th 142, 188.)

## IV.

### *Cumulative Error*

Renz argues the cumulative error doctrine applies to his asserted claims of error. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) However, where, as here, there are no errors to aggregate, there is no cumulative error. (See, e.g., *People v. Lua* (2017) 10 Cal.App.5th 1004, 1019 [cumulative error doctrine did not apply where "we have found no error, though we have considered the issue of prejudice as an alternative basis for rejecting defendant's claims of error"].)

## V.

### *Imposition of Fines and Fees*

A.   *Fees on Dismissed Counts*

Renz contends, the Attorney General concedes, and we agree that the trial court erred in imposing a criminal conviction assessment (Gov. Code, § 70373[7]) and court operations assessment (§ 1465.8[8]) on all seven counts, when counts 5 and 6 were dismissed at the People's request prior to sentencing. The trial court should have imposed a criminal conviction assessment and court operations assessment only as to counts 1 to 4 and 7.

---

[7]   Government Code section 70373 requires the imposition of a $30 assessment on every felony or misdemeanor conviction "[t]o ensure and maintain adequate funding for court facilities."

[8]   Section 1465.8 requires the court to impose an assessment of $40 on "every conviction for a criminal offense," with certain exceptions "[t]o assist in funding court operations."

However, the abstract of judgment shows the trial court imposed a $210 criminal conviction assessment and $280 court operations assessment, indicating these assessments were imposed on all seven counts. The abstract of judgment should be modified to reduce the criminal conviction assessment to $150 and the court operations assessment to $200.

B.    *Forfeited Claim to Hearing on Inability to Pay*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Renz contends the court violated his constitutional right to due process by imposing fines and fees without holding a hearing on his ability to pay. We agree with the Attorney General's contention that Renz forfeited this claim by not objecting to the fines and fees when they were imposed.[9]

At the sentencing hearing, the trial court ordered defendant to pay a restitution fine of $10,000 (§ 1202.4), a stayed parole revocation restitution

---

[9]    "At the core of the *Dueñas* opinion is its holding that imposition of fines, fees or assessments without a hearing on ability to pay denies due process. It was that court's view it was the trial court's duty to hold a hearing and thus failure to seek a hearing did not result in forfeiture. Further, the court found that the burden to prove 'present' ability to pay was on the prosecution. Other courts, including this court, have disagreed with *Dueñas* on these key principles." (*People v. Keene* (2019) 43 Cal.App.5th 861, 863.) It is not necessary in this case for us to reach the broader issues of *Dueñas*. The Supreme Court is currently considering the viability of *Dueñas* as it pertains to whether a trial court must consider a criminal defendant's ability to pay assessed fines and fees, and if so, which party bears the burden of proof. (*People v. Kopp* (2019) 38 Cal.App.5th 47 (*Kopp*), review granted on limited issues Nov. 13, 2019, S257844.)

fine of $10,000 (§ 1202.45) and various other fees and assessments totaling an additional $648.[10]

Section 1202.4 authorizes a restitution fine of up to $10,000 in felony cases and requires a sentencing court to impose a minimum fine of $300, notwithstanding a defendant's inability to pay that amount. However, even before *Dueñas*, which was issued before Renz's sentencing hearing,[11] it was clear a defendant's ability to pay was a relevant consideration in determining whether to impose a restitution fine greater than the statutory minimum. Section 1202.4, subdivision (d) provides in relevant part: "In setting the amount of the fine pursuant to subdivision (b) *in excess of the minimum fine* pursuant to paragraph (1) of subdivision (b), the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay[.]"

Renz had the burden to explain to the court why it should impose a lesser amount. (§ 1202.4, subd. (d) ["A defendant shall bear the burden of demonstrating his or her inability to pay."]; *People v. Avila* (2009) 46 Cal.4th 680, 729.) In cases since *Dueñas*, courts have concluded that when challenging a maximum fine, defendants bear the initial burden of advising the court that they are unable to pay the fines and/or fees that the court proposes to assess. (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 (*Gutierrez*) ["[E]ven before *Dueñas* a defendant had every incentive to object

---

10    The fees and assessments include: (1) an emergency medical air transport fee of $4; (2) a $210 criminal conviction assessment (Gov. Code, § 70373); (3) a $280 court operations assessment (§ 1465.8); and (4) a criminal justice fee of $154 (Gov. Code, § 29550.1).

11    *Dueñas* was issued on January 8, 2019. Renz's sentencing hearing was held on February 18, 2020.

to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute (§ 1202.4, subd. (c)) expressly permitted such a challenge."]; *People v. Castellano* (2019) 33 Cal.App.5th 485, 490 ["Consistent with *Dueñas*, a defendant must in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed[.]"]; (*Kopp*, *supra*, 38 Cal.App.5th at p. 96 ["[W]e want to make clear that it is Appellants' burden to make a record below as to their ability to pay these assessments."].)

Here, Renz did not object to the court's imposition of fees and assessments, request a hearing on his ability to pay, or submit any evidence of a claimed inability to do so. Had Renz done so, the trial court could have exercised its discretion and considered his ability to pay, along with other relevant factors, in ascertaining the fine amount. Having failed to do so, Renz's argument regarding his ability to pay the assessed restitution fee is forfeited. (*Gutierrez*, *supra*, 35 Cal.App.5th at p. 1033.) Moreover, because he did not object to the $10,000 restitution fine, Renz has similarly forfeited any challenge to the fees and assessments totaling $648. (*Ibid*.)

VI.

*Abstract of Judgment*

Renz contends, and the Attorney General concedes, that the abstract of judgment fails to correctly reflect that the execution of sentence on count 3 was stayed under section 654. We agree.

"Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) Such discrepancies are "presumed to be the result of clerical error." (*People v. Price* (2004) 120 Cal.App.4th 224, 242.) "Courts may correct

38

clerical errors at any time," for instance, by ordering "correction of abstracts of judgment that [do] not accurately reflect the oral judgments of sentencing courts." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

At the sentencing hearing, the trial court sentenced Renz to "11 years on [c]ount 3, 11 years on [c]ount 4, and [ordered] that [punishment] will be stayed per Penal Code [section] 654." In response to the prosecutor's suggestion that sentence on these counts should be imposed pursuant to the one-third-the-midterm rule, the court stated the sentences were "concurrent" and "run ... [the] full strength."[12] On the determinate abstract of judgment, the clerk then indicated a "TOTAL TIME" of 11 years in box 8 and noted in paragraph 13 under "Other orders" that counts 3 and 4 and their enhancements were stayed pursuant to section 654. It is clear the trial court intended to impose an 11-year sentence for each of counts 3 and 4, to run concurrently, but then stayed both pursuant to section 654.

---

[12]    The trial court is correct that the one-third-the-midterm rule does not apply here, but not for the reason it stated. "When a defendant suffers multiple convictions, sentencing for some of which is precluded by operation of section 654, an acceptable procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable. Such stay is to be effective pending the successful service of sentence for the more serious conviction, at which time the stay is to become permanent." (*People v. Miller* (1977) 18 Cal.3d 873, 886, superseded by statute on other grounds as recognized in *People v. Young* (1982) 98 Cal.App.3d 953.) Further, the " 'one-third-the-midterm rule of section 1170.1, subdivision (a), only applies to a consecutive sentence, not to a sentence stayed under section 654.' [Citation] To effectuate section 654, the trial court must impose a full term and stay execution of that term." (*People v. Relkin* (2016) 6 Cal.App.5th 1188, 1197–1198; see also *People v. Alford* (2010) 180 Cal.App.4th 1463, 1468–1469.) Accordingly, here, the one-third-the-midterm rule was not applicable, and the trial court followed the appropriate procedure by imposing but staying full, concurrent terms on counts 3 and 4.

However, the abstract of judgment does not properly reflect the court's sentence. First, the box indicating whether the punishment on count 3 was stayed under section 654 is erroneously unchecked. Second, the abstract of judgment has a box to mark either: (1) "S" for stayed, if the enhancement sentence has been stayed; or (2) to provide a number for the length of the prison term imposed. The clerk erroneously wrote "1" in this box for count 3. Renz contends, the Attorney General concedes, and we agree that the clerk's notation in paragraph 13 under "Other orders" is insufficient to alleviate the confusion caused by these errors.

Renz additionally proposes the "10 years 0 months" on the time imposed for count 3 be stricken from the abstract. The Attorney General disagrees, and contends that parentheses should be placed around this figure and the "11" on box 8 to correctly denote the trial court's concurrent sentences. We agree with the Attorney General.

We do not agree with either party that the "1 year 0 months" figure as directed to the enhancement of count 3 should be stricken. Striking this would not accurately reflect the fact that the trial court imposed and then stayed the enhancements to counts 3 and 4. Instead, parentheses should be placed around this figure.

In sum, the abstract of judgment must be amended as follows: (1) on count 3, the box for "654 STAY" should be checked and the "10" in the "YRS" column and the "0" in the "MOS" column should be placed in parenthesis; (2) on count 4, "(10)" should be inserted under "YRS" and "(0)" under "MOS" to indicate the concurrent term; (3) on the enhancement to count 3, the "1" in the "TIME IMPOSED" box should be replaced with a "S" and "1" year "0" months should be placed in parenthesis; (4) on the enhancement to count 4, a "(1)" and "(0)" should be inserted under years and months to indicate the

concurrent term; and (5) the total time of "11" years and "0" months in box 8 should be placed in parenthesis.

## DISPOSITION

The trial court is directed to prepare an amended abstract of judgment reducing the criminal conviction assessment to $150 and the court operations assessment to $200. The trial court is also instructed to amend the abstract of judgment so that: (1) the box for "654 STAY" is checked and the "10" in the "YRS" column and the "0" in the "MOS" column are placed in parenthesis on count 3; (2) "(10)" is inserted under "YRS" and "(0)" is inserted under "MOS" on count 4; (3) the "1" in the "TIME IMPOSED" box is replaced with a "S" and "1" year "0" months is placed in parenthesis on the enhancement to count 3; (4) a "(1)" and "(0)" are inserted under years and months on the enhancement to count 4; and (5) the total time of "11" years "0" months in box 8 is placed in parenthesis. The trial court is directed to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


DO, J.

WE CONCUR:


HALLER, Acting P. J.


AARON, J.


41